Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EMIL ALPERIN; JEWGENIJA
ROMANOVA; MARIA DANKEWITSCH;
VLADIMIR MORGUNOV, on behalf of
themselves and all other persons
similarly situated;
ORGANIZATION OF UKRAINIAN
ANTIFASCIST RESISTANCE FIGHTERS;
UKRAINIAN UNION OF NAZI
VICTIMS AND PRISONERS; VLADIMIR
BRODICH; WILLIAM DORICH; IGOR
NAJFELD, on behalf of themselves
and all other persons similarly
situated; LIZABETH LALICH; MLADEN
DJURICICH; ROBERT PREDRAG
GAKOVICH; NEVENKA VUKASOVIC
MALINOWSKI; ELI ROTEM; MILORAD
SKORIC; VELJKO MILJUS; FRED
ZLATKO HARRIS; MILJA CONGER;
ALLEN DOLFI HERSKOVICH; BOGDAN
KLJAIC; DAVID LEVY; ZDENKA
BAUM RUCHWARGER; VLADAN
CELEBONOVIC; DESA TOMASEVIC
WAKEMAN; DANIEL PYEVICH;
KOVILJKA POPOVIC; JASENOVAC
RESEARCH INSTITUTE; THE
INTERNATIONAL UNION OF FORMER

No. 03-15208
D.C. No.
CV-99-04941-MMC

6643

JUVENILE PRISONERS OF FASCISM OF
UKRAINE, RUSSIA, AND BELARUS, on
behalf of themselves and all others
similarly situated,
                    *Plaintiffs-Appellants,*

                    v.

VATICAN BANK, aka Institute of
Religious Works aka Instituto per
le Opere Di Religione (IOR);
FRANCISCAN ORDER (OFM),
INCLUDING CROATIAN FRANCISCANS;
CROATIAN COFRATERNITY OF THE
COLLEGE OF SAN GIROLAMO DEGLI
ILLIRICI, and its successors, Swiss,
Austrian, Argentine, Spanish,
Italian, Portuguese, Vatican &
German Banking Institutions;
CROATIAN LIBERATION MOVEMENT
(HOP),
                    *Defendants-Appellees.*

EMIL ALPERIN; JEWGENIJA
ROMANOVA; MARIA DANKEWITSCH;
VLADIMIR MORGUNOV, on behalf of
themselves and all other persons
similarly situated;
ORGANIZATION OF UKRAINIAN
ANTIFASCIST RESISTANCE FIGHTERS;
UKRAINIAN UNION OF NAZI
VICTIMS AND PRISONERS; VLADIMIR
BRODICH; WILLIAM DORICH; IGOR

No. 03-16166

D.C. No.
CV-99-04941-MMC

AMENDED
OPINION AND
AMENDED
CONCURRENCE/
DISSENT

NAJFELD, on behalf of themselves and all other persons similarly situated; LIZABETH LALICH; MLADEN DJURICICH; ROBERT PREDRAG GAKOVICH; NEVENKA VUKASOVIC MALINOWSKI; ELI ROTEM; MILORAD SKORIC; VELJKO MILJUS; FRED ZLATKO HARRIS; MILJA CONGER; ALLEN DOLFI HERSKOVICH; BOGDAN KLJAIC; DAVID LEVY; ZDENKA BAUM RUCHWARGER; VLADAN CELEBONOVIC; DESA TOMASEVIC WAKEMAN; DANIEL PYEVICH; KOVILJKA POPOVIC; JASENOVAC RESEARCH INSTITUTE; THE INTERNATIONAL UNION OF FORMER JUVENILE PRISONERS OF FASCISM OF UKRAINE, RUSSIA, AND BELARUS, on behalf of themselves and all others similarly situated; ORGANIZATION OF UKRAINIAN ANTIFASCIST RESISTANCE FIGHTERS; UKRAINIAN UNION OF NAZI VICTIMS AND PRISONERS,

*Plaintiffs-Appellants,*

v.

VATICAN BANK, aka Institute of Religious Works aka Instituto per le Opere Di Religione (IOR); FRANCISCAN ORDER (OFM), INCLUDING CROATIAN FRANCISCANS;

CROATIAN COFRATERNITY OF THE
COLLEGE OF SAN GIROLAMO DEGLI
ILLIRICI, and its successors, Swiss,
Austrian, Argentine, Spanish,
Italian, Portuguese, Vatican &
German Banking Institutions;
CROATIAN LIBERATION MOVEMENT
(HOP),
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
October 7, 2004—San Francisco, California

Filed April 18, 2005
Amended June 9, 2005

Before: Stephen S. Trott, M. Margaret McKeown,
Circuit Judges, and Milton I. Shadur, Senior Judge.*

Opinion by Judge McKeown
Partial Concurrence and Partial Dissent by Judge Trott

---

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

**COUNSEL**

Kathryn Lee Boyd, Pepperdine University Law School, Malibu, California; Jonathan H. Levy, Cincinnati, Ohio; Thomas Easton, Eugene, Oregon, for the plaintiffs-appellants.

Jeffrey S. Lena, Berkeley, California; Paul E. Vallone, Hinshaw & Culbertson, San Francisco, California, for the defendants-appellees.

**OPINION**

McKEOWN, Circuit Judge:

We are faced here with the question whether claims for losses allegedly suffered at the hands of a Nazi puppet regime during World War II are cognizable in our courts today. Because these claims, at least superficially, touch on foreign relations and potentially controversial political issues, it is tempting to jump to the conclusion that such claims are barred by the political question doctrine. The Supreme Court has counseled, however, that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962). The justiciability inquiry is limited to " 'political questions,' not . . . 'political cases,' " *id.* at 217, and should be made on a "case-by-case" basis, *id.* at 211.

Although the political question doctrine often lurks in the shadows of cases involving foreign relations, it is infrequently addressed head on. *See, e.g.*, *Hwang Geum Joo v. Japan*, 332 F.3d 679, 682 (D.C. Cir. 2003), *vacated and remanded by* 124 S. Ct. 2835 (2004) (explaining that because the district court did not have subject matter jurisdiction in case involving World War II-era claims against Japan, "[n]or . . . need we consider whether the political question doctrine would also bar its adjudication"). The procedural posture of this case, however, places the issue squarely before us.

With these principles in mind, in determining the threshold issue of justiciability, we scrutinize each claim individually. Indeed, in our system of separation of powers, we should not abdicate the court's Article III responsibility—the resolution of "cases" and "controversies"—in favor of the Executive Branch, particularly where, as here, the Executive has declined a long-standing invitation to involve itself in the dispute. We conclude that some of the claims are barred by the political question doctrine and some of the claims are justiciable. Although the parties have multiple procedural and substantive challenges to overcome down the road, they are entitled to their day—or years—in court on the justiciable claims.

A group of twenty-four individuals and four organizations (the "Holocaust Survivors") claim that the Vatican Bank, known by its official title *Istituto per le Opere di Religione*, the Order of Friars Minor, and the Croatian Liberation Movement (*Hrvatski Oslobodilacki Pokret*), profited from the genocidal acts of the Croatian Ustasha political regime (the "Ustasha"), which was supported throughout World War II by Nazi forces. That profit allegedly passed through the Vatican Bank in the form of proceeds from looted assets and slave labor. The Holocaust Survivors brought suit in federal court claiming conversion, unjust enrichment, restitution, the right to an accounting, and human rights violations and violations of international law arising out of the defendants' alleged

involvement with the Ustasha during and following World War II.

The Vatican Bank and the Order of Friars Minor moved to dismiss the Holocaust Survivors' complaint on multiple grounds; by agreement of the parties the district court limited its discussion to the issue of whether the Holocaust Survivors' claims should be dismissed under the political question doctrine. The district court reasoned that the political question doctrine bars consideration of the merits of the claims in their entirety. The district court dismissed the action against the Croatian Liberation Movement, which never appeared in the action, on the grounds that the claims were barred by both the political question doctrine and the lack of personal jurisdiction over this defendant. We reverse in part because certain of the Holocaust Survivors' claims—those with respect to lost and looted property (conversion, unjust enrichment, restitution, and an accounting)—are not barred by this doctrine. In contrast, the broad human rights allegations tied to the Vatican Bank's alleged assistance to the war objectives of the Ustasha present nonjusticiable controversies. Like the district court, we hold that the court did not have personal jurisdiction over the Croatian Liberation Movement.[1] Consequently, we see no reason to reach the political question doctrine vis-à-vis this defendant.

Bearing in mind that "[t]he decision to deny access to judicial relief is not one we make lightly," *Liu v. Republic of*

---

[1]Even though a plaintiff need make only a prima facie showing of jurisdiction at this stage in a litigation, *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1119 (9th Cir. 2002), the Holocaust Survivors' bare-bones assertions that the Croatian Liberation Movement has been "active" within the United States at some point and at least a few members have ties to this country are insufficient for us to conclude that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

*China*, 892 F.2d 1419, 1433 (9th Cir. 1989) (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1360 (9th Cir. 1981)), we conclude that the political question doctrine does not create an absolute barrier to the Holocaust Survivors' property claims. To conclude otherwise would be to shirk our judicial role as "[c]ourts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).

That said, it bears noting that our initial determination of justiciability in no way reflects any judgment on the threshold legal hurdles that must be overcome or the merits of the claims. Much of the dissent focuses on downstream issues related to potential procedural and substantive pitfalls of the claims. We do not discount the difficulties that may lie ahead; however, consideration of those issues is premature. Given the passage of time, the generality of the allegations, the question of the applicability of the Foreign Sovereign Immunities Act, intricacies of the alleged claims, the class certification issues, whether the claimants have a cognizable legal claim, and a myriad of other procedural and jurisdictional hurdles, the Holocaust Survivors may indeed face an uphill battle in pursuing their claims. But this spectre of difficulty down the road does not inform our justiciability determination at this early stage of the proceedings.

Our conclusion is rooted in the principles of *Baker v. Carr*. Despite the dissent's cataclysmic and speculative projections about the sweep of our opinion, our decision boils down to letting the common law property claims proceed to the next stage and foreclosing the political, human rights, and war-related claims. In so doing, we respect the limits of our jurisdiction as a national court, recognize the role of the Executive in foreign relations, and stick to our role of interpreting the law.

## I. BACKGROUND

### A. WORLD WAR II AND THE USTASHA TREASURY

The events at issue relate back to the actions of the Vatican during and in the years following World War II.[2] Following Germany's blitzkrieg through Yugoslavia in 1941, a government composed of members of the Ustasha was proclaimed the head of a protectorate of Italy. *See* Ustasha Treasury Report[3] at 141. The Ustasha regime was supported throughout World War II by German and Italian occupation forces. *Id.*

---

[2]Regarding terminology, the Vatican City and the Holy See are closely related but not interchangeable entities:

> The term "Holy See" refers to the composite of the authority, jurisdiction, and sovereignty vested in the Pope and his advisers to direct the worldwide Roman Catholic Church. . . . . Created in 1929 to provide a territorial identity for the Holy See in Rome, the State of the Vatican City is a recognized national territory under international law. The Holy See, however, enters into international agreements and receives and sends diplomatic representatives.

*See* U.S. Dep't of State, Background Note: The Holy See (Oct. 2004), *available at* http://www.state.gov/r/pa/ei/bgn/3819.htm ("Vatican Background Note"). *See generally* Robert John Araujo, *The International Personality and Sovereignty of the Holy See*, 50 Cath. U. L. Rev. 291 (2001) (providing historical overview of the Holy See's foreign relations and arguing that it is a subject of international law). These nuances are not critical for purposes of this opinion. Therefore, for convenience, the term "Vatican" will be used to refer generally to the Catholic leadership centered in the Vatican City.

[3]In the late 1990s, the U.S. Government prepared a report on the Ustasha wartime treasury as part of a larger effort "to confront the largely hidden history of Holocaust-related assets after five decades of neglect." Bureau of Public Affairs, U.S. Dep't of State, Pub. No. 10557, U.S. Allied Wartime and Postwar Relations and Negotiations With Argentina, Portugal, Spain, Sweden, and Turkey on Looted Gold and German External Assets and U.S. Concerns About the Fate of the Wartime Ustasha Treasury, Supplement to the Preliminary Study on U.S. and Allied Efforts to Recover and Restore Gold and Other Assets Stolen or Hidden by Germany During World War II iii (1998) ("Ustasha Treasury Report").

Although the United States and its allies were aware to some extent of the Ustasha's atrocities, "It is not clear if the Allied leaders clearly grasped that as many as 700,000 victims, most of them Serbs, had been killed at the Ustasha death camps . . . ." *Id.* at 142. The State Department's report describes the Vatican's role in less generous terms: "The Vatican, which maintained an 'Apostolic visitor' in Zagreb from June 1941 until the end of the War, was aware of the killing campaign . . . . Croatian Catholic authorities condemned the atrocities committed by the Ustashi, but remained otherwise supportive of the regime." *Id.* at 143.

The connections between the Vatican and the Ustasha reportedly continued in the years following World War II:

> With the defeat in May 1945 of Hitler and his satellites, including puppet Croatia, the leaders of the Ustasha fled to Italy, where they found sanctuary at the pontifical College of San Girolamo in Rome. This College was most likely funded at least in part by the remnants of the Ustasha treasury, and appeared to operate with at least the tacit acquiescence of some Vatican officials.

*Id.* at xviii. It is unclear to what extent the Vatican was aware of these activities, but the State Department is dubious that they were oblivious to the Ustasha's presence:

> Although no evidence has been found to directly implicate the Pope or his advisers in the postwar activities of the Ustasha in Italy, it seems unlikely that they were entirely unaware of what was going on. Vatican authorities have told us they have not found any records that could shed light on the Ustasha gold question.

*Id.* at 156.

The size and nature of the Ustasha treasury remains in considerable doubt. According to the State Department, "The figure of 350 million Swiss francs (over $80 million) of Ustasha gold that U.S. intelligence reported in 1946 remains the only attempt to estimate the total financial resources available to the Ustashi at the end of World War II." *Id.* at 150. The State Department cautions that this estimate "remains unsubstantiated and may not include some or all of the sums reported elsewhere." *Id.*

## B.   THE HOLOCAUST SURVIVORS' CLAIMS

This background section on the claims is drawn from the Holocaust Survivors' Third Amended Class Action Complaint (the "Complaint"), which is detailed and lengthy and references a number of outside sources, such as the Ustasha Treasury Report. At this stage of the proceedings, we accept the allegations as true. *See California v. United States*, 104 F.3d 1086, 1089 (9th Cir. 1997) (when reviewing a district court's grant of a motion to dismiss, this court accepts the facts alleged in the complaint as true).

### 1.   PLAINTIFFS

The Complaint was filed on behalf of the named plaintiffs and the following class:

> [A]ll Serbs, Jews, and former Soviet Union citizens (and their heirs and beneficiaries), who suffered physical, monetary and/or property losses including slave labor, due to the systematic and brutal extermination of Jews, Serbs, and Romani by the [Ustasha], and as a result of the occupation of the former Soviet Union by Croatian military forces in concert with their German occupation forces.

The potential class is massive: Plaintiff Ukrainian Union of Nazi Victims And Prisoners "represents over 300,000 former

slave and forced laborers, prisoners, concentration camp, and ghetto survivors." The geographic scope of the class is also far reaching with the Ustasha's destruction extending beyond Croatia to Bosnia, Yugoslavia, and the Soviet Union, including Ukraine, Belarus, and Russia.

The jurisdictional bases of the Holocaust Survivors' claims are similarly expansive. They claim jurisdiction pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 ("FSIA"), 28 U.S.C. § 1331, federal common law as it incorporates customary international law and treaties, diversity jurisdiction, and California state law.[4]

---

[4]The viability of the Holocaust Survivors' claims apart from the issue of the political question doctrine is not before us. Nevertheless, looking ahead, we note that the statutory grounds on which the Holocaust Survivors base their claims have, for the most part, not fared well in recent litigation. Just last term, the Supreme Court limited the ATS in *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2764 (2004) (curtailing the scope of actionable international norms under the ATS but explaining that "the door is still ajar subject to vigilant doorkeeping"); *see also Weiss v. Am. Jewish Comm.*, 335 F. Supp. 2d 469 (S.D.N.Y. 2004) (dismissing claim under the ATS for injunctive relief in connection with the construction of a Holocaust memorial in light of the Court's holding in *Sosa*). The contours of the FSIA have also changed with the Supreme Court's holding in *Republic of Austria v. Altmann*, 541 U.S. 677, 124 S. Ct. 2240 (2004), that the FSIA applies retroactively. *See also Abrams v. Societe Nationale des Chemins de Fer Francais*, 389 F.3d 61, 64-65 (2d Cir. 2004) (dismissing case for lack of subject matter jurisdiction because the French government's acquisition of defendant railroad company immunized it from suit under the FSIA). In *Deutsch v. Turner Corp.*, 324 F.3d 692, 719 (9th Cir. 2003), we held that a California statute on which the Holocaust Survivors' claims are based in part, Cal. Civ. Proc. Code § 354.6, unconstitutionally intruded on the foreign affairs power of the federal government. We leave the district court to determine in the first instance to what extent the Holocaust Survivors have correctly invoked these and other jurisdictional bases.

## 2.  DEFENDANTS

The Complaint does not name the Vatican itself as a defendant but rather focuses on a closely related entity, the Vatican Bank.[5] The exact relationship between the Vatican and the Vatican Bank is less than clear at this stage of the proceedings. We are in no position to make a substantive judgment about the nature of the Vatican Bank.[6] The Complaint, which we accept at face value, distinguishes between the two entities. The Vatican Bank has its principal place of business in the Vatican City and is headed by a Bishop, but it conducts transactions worldwide including "for-profit merchant banking transactions in the United States, California, and elsewhere."

The actual dealings of the bank, however, are murky. Indeed, the Vatican Bank's holdings and its specific transactions are opaque. In his declaration in support of the Holocaust Survivors' motion for early jurisdictional discovery, John Loftus—a former prosecutor with the U.S. Department

---

[5]The Complaint also names "Unknown Catholic Religious Orders," a number of banking institutions (both named institutions and "Does #1-100") and "unknown recipients of Nazi and Ustasha loot" as defendants. The Holocaust Survivors voluntarily dismissed their claims against defendant Swiss National Bank in 2002.

[6]Like its other ominous projections, the dissent jumps ahead to conclude that this suit is "functionally" against "the Vatican itself" and "the Vatican Bank, which is an instrumentality of the sovereign state of the Vatican," and possibly even the Pope. Dissent at 6705. But we are nowhere near the point of making such an assessment. Because this case comes to us at the motion to dismiss stage, we must accept the Complaint's demarcation between the Vatican Bank, which is named as a defendant, and the Vatican, which is not named as a defendant. Further, the potential overtones that this case may have on relations with the Vatican leadership do not, as the dissent suggests, warrant dismissal. *See Antolok v. United States*, 873 F.2d 369, 392 (D.C. Cir. 1989) (Wald, C.J., concurring in judgment only) ("I read [*Baker v. Carr*] as a reminder that our focus should be on the particular issue presented for our consideration, not the ancillary effects which our decision may have on political actors.").

of Justice's Nazi-hunting unit—attests, "The Vatican Bank is one of the most secretive financial institutions in the world. The exact nature and ownership of the Vatican Bank is difficult to ascertain owing to the secrecy surrounding it."

The bank's dealings and ownership may be shrouded in mystery, but the Vatican considers itself to have a stake in the outcome of these proceedings. In specific reference to this case, the Vatican's Secretariat of State sent a Verbal Note of Protest, dated October 23, 2000, to the U.S. Embassy in Rome requesting as follows:

> Basing itself upon the diplomatic relations which exist between the United States of America and the Holy See, as well as the recognition which the Government of the United States has accorded to the sovereignty of the Holy See and of Vatican City State, the Secretariat of State requests the intervention of the Federal Government of the United States of America.

The Order of Friars Minor joined the Vatican Bank in bringing the motion to dismiss. A religious brotherhood founded by St. Francis Assisi, the organization includes "several Croatian Franciscan Orders in California, the United States, Croatia, and Italy." During World War II, "Many high officials of the Ustasha government were Roman Catholic clergy and, in particular, Franciscans." These ties continued after the war with the Order of Friars Minor providing aid to former Ustasha.

Neither the district court nor the Holocaust Survivors distinguished between the Vatican Bank and Order of Friars Minor in the treatment of the political question doctrine. Likewise, because no distinction can be made on the basis of the pleadings, we also address the two defendants together. For ease of reference, from this point on in the opinion we refer to them collectively as the "Vatican Bank."

The third defendant, the Croatian Liberation Movement, is identified "as the successor to the Ustasha government." The Croatian Liberation Movement allegedly "functioned as a government in exile and coordinated terrorist activities in the United States and elsewhere."

### 3.  CAUSES OF ACTION

The Complaint describes in detail the atrocities inflicted on the Holocaust Survivors during World War II by the Ustasha and, more generally, by allied Fascists "believed to be Croatians." In addition to describing the looting of assets, the Complaint recites genocidal acts of the Ustasha, including those carried out at the "Jasenovac Concentration Camp complex, termed by historians as the 'Auschwitz of the Balkans.' "

Upon the collapse of the Ustasha regime in 1945, the Holocaust Survivors maintain that "all or a portion of the Ustasha Treasury was transferred to cooperative Roman Catholic clergyman [sic] and Franciscans for transport to Rome where Franciscans sympathetic to the Ustasha were based." These funds eventually found their way into the hands of the Vatican Bank, among other recipients. As alleged in the Complaint, "A 1948 U.S. Army Intelligence reports [sic] confirmed 2,400 kilos of Ustasha stolen gold were moved from the Vatican to one of the Vatican's secret Swiss bank accounts." In the decades following World War II, the Holocaust Survivors contend that the Vatican Bank and the Croatian Liberation Movement continued to profit from transactions involving the Ustasha treasury.

Having set forth these general allegations, the Complaint advances five causes of action:

*Conversion*: The Holocaust Survivors first allege, "Defendants . . . have willfully and wrongfully misappropriated and

converted the value of [property taken from the Holocaust Survivors] and its derivative profits into their own property."

*Unjust Enrichment*: Second, defendants were unjustly enriched by "receiv[ing] stolen property given to them by members of the Ustasha Regime, which rightfully belongs to [the Holocaust Survivors], as well as the value of slave labor performed."

*Restitution*: The Holocaust Survivors allege in their third claim that their "goods and property have been taken, thus denying [them] the use and enjoyment thereof; Defendants have wrongfully used and profited from that property." Maintaining that "compensation in damages is inadequate in that the property taken cannot be replaced and the harm inflicted cannot be undone by mere compensation," the Holocaust Survivors call for "equitable remedies."

*Accounting*: Fourth, the Holocaust Survivors request "the equitable remedy of accounting," alleging that "Defendants have never accounted for or paid the value of Plaintiffs' property or the profits which Defendants have derived from that property, either during World War II or since World War II ended."

*Human Rights Violations and Violations of International Law*: Finally, the Holocaust Survivors allege:

> Defendants participated in the activities of the Ustasha Regime in furtherance of the commission of war crimes, crimes against humanity, crimes against peace, torture, rape, starvation, physical and mental abuse, summary execution and genocide. Specifically, the actions and conduct of Defendants, in addition to being profitable, actively assisted the war objectives of the Ustasha Regime.

The Complaint condemns the defendants' aiding and abetting of war criminals after World War II by helping them to evade prosecution and to preserve the Ustasha treasury.

The Holocaust Survivors cite a multitude of legal bases for these claims: "Defendants' actions were in violation of numerous international treaties and the fundamental human rights laws prohibiting genocide, war crimes, crimes against humanity and crimes against peace. Defendants' actions violated customary international law . . . ." They also claim that "Defendants committed torts under the laws of the United States, requiring Defendants to pay . . . appropriate compensatory and punitive damages for . . . injuries and losses."

## C.   OVERVIEW OF THE POLITICAL QUESTION DOCTRINE

Our inquiry proceeds from the age-old observation of Chief Justice Marshall that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Although the principle behind the political question doctrine was announced over two hundred years ago in *Marbury*, the Supreme Court has addressed the doctrine in surprisingly few cases. *See Atlee v. Laird*, 347 F. Supp. 689, 693-703 (E.D. Pa. 1972) (three-judge court), *aff'd sub nom. mem.*, *Atlee v. Richardson*, 411 U.S. 911 (1973), (detailed "case by case" analysis of the development of the doctrine).

**[1]** In the landmark case of *Baker v. Carr*, the Supreme Court provided its most comprehensive discussion on the application of the doctrine. Recognizing that the attributes of the political question doctrine "diverge, combine, appear, and disappear in seeming disorderliness" in various settings, the Court set out to illuminate the "contours" of the doctrine. 369 U.S. at 210-11; *see also* Erwin Chemerinsky, Constitutional Law: Principles and Policies § 2.8.1 (1997) ("In many ways, the political question doctrine is the most confusing of the jus-

ticiability doctrines."). The Court explained that the political question doctrine has its roots in the separation of powers and set forth six formulations for courts to consider in determining whether they should defer a case to the political branches:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217.

**[2]** Dismissal on the basis of the political question doctrine is appropriate only if one of these formulations is "inextricable" from the case. *Id.* Although termed as "formulations" in *Baker*, the plurality in *Vieth v. Jubelirer*, 541 U.S. 267, 124 S. Ct. 1769, 1776 (2004), recently described these criteria as "six independent tests." But these tests are more discrete in theory than in practice, with the analyses often collapsing into one another. *See Nixon v. United States*, 506 U.S. 224, 228-29 (1993) (describing interplay between the first and second *Baker* tests). This overlap is not surprising given the common underlying inquiry of whether the very nature of the question is one that can properly be decided by the judiciary.

Addressing foreign affairs specifically, *Baker* cautioned against "sweeping statements" that imply all questions involv-

ing foreign relations are political ones. 369 U.S. at 211 (citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative— 'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.")). Instead, the Court instructed that courts should undertake a discriminating case-by-case analysis to determine whether the question posed lies beyond judicial cognizance. 369 U.S. at 211. Informing this inquiry are considerations of "the history of [the question's] management by the political branches," its "susceptibility to judicial handling," and "the possible consequences of judicial action." *Id.* at 211-12.

Despite this caution that it is impossible to decide cases raising the political question doctrine "by any semantic cataloguing," *id.* at 217, certain families of cases have emerged in the foreign affairs realm. *See, e.g.*, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-31 (1986) (interpretation of statutes involving foreign affairs is a justiciable question); *Goldwater v. Carter*, 444 U.S. 996, 1002-04 (1979) (four-justice plurality concluding that a challenge to the President's unilateral termination of a treaty presents a political question); *Ludecke v. Watkins*, 335 U.S. 160, 168 (1948) (termination of war is a political question); *Oetjen*, 246 U.S. at 302 (Executive's recognition of a foreign government is a political question). In general, however, *Baker*'s admonition has proved true that most cases involving foreign affairs fail to fall neatly into categories on one side or the other of the justiciable/nonjusticiable line. As a result, the overarching *Baker* tests remain the starting point of our inquiry.

Following *Baker*, the Supreme Court has not retreated from the analytical framework it established. *See Vieth*, 124 S. Ct. at 1776 (reiterating *Baker* formulations); *Davis v. Bandemer*, 478 U.S. 109, 121-27 (1986) (reciting *Baker* formulations and declining Justice O'Connor's implicit invitation to rethink

that approach). Subsequent decisions have elaborated on the various criteria. In particular, the *Vieth* plurality's observation that the *Baker* tests "are probably listed in descending order of both importance and certainty," 124 S. Ct. at 1776, is borne out by the disproportionate emphasis on the first two tests in both Supreme Court and lower court cases. *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 548-49 (1969) (dismissing five *Baker* formulations as inapplicable in two paragraphs after an extensive discussion of the first test); *see also El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1367 (Fed. Cir. 2004) (focusing on first *Baker* formulation in holding that the Constitution, "in its text and by its structure, commits to the President the power to make extraterritorial enemy property designations"); *Made in the USA Found. v. United States*, 242 F.3d 1300, 1312-19 (11th Cir. 2001) (briefly addressing "prudential considerations" after analyzing the first and second *Baker* formulations at length in concluding that the question of what constitutes a treaty is a political question); *In re African-American Slave Descendants Litig.*, 304 F. Supp. 2d 1027, 1056-63 (N.D. Ill. 2004) (discussing first and second *Baker* formulations extensively in determining that slave reparation claims were not justiciable). *But see United States v. Munoz-Flores*, 495 U.S. 385, 390-93 (1990) (briefly dismissing other *Baker* formulations after explaining that mere judicial scrutiny of a congressional enactment does not show a lack of respect for Congress under the fourth *Baker* formulation). Similarly, the district court in this case addressed only the first and second considerations and found that both counseled in favor of dismissal.

Perhaps not surprisingly, our analysis also focuses on the first two considerations because they are the most significant in the face of the specific allegations of the Complaint. Before we proceed to evaluate the Holocaust Survivors' claims, it is useful to take a short detour through the World War II Holocaust claims cases as they pertain to the political question doctrine.

## D. THE POLITICAL QUESTION DOCTRINE AND WORLD WAR II-ERA CLAIMS

The late 1990s saw a flurry of legal activity over Holocaust-era claims after years of quietude. *See* Michael J. Bazyler, *Nuremberg in America: Litigating the Holocaust in United States Courts*, 34 U. Rich. L. Rev. 1, 19 (2000) ("A total of ten cases involving Holocaust-era claims were filed in the United States between the end of World War II and October 1996, the start of the new era of Holocaust-claim litigation.").[7] The cases break down into several categories: finding of justiciability, finding of no justiciability, and skirting the political question doctrine or not reaching the doctrine.

The Eleventh Circuit's recent decision involving claims against banks falls into the first category. The court held that claims against two German banks that profited from the practice of Aryanization during World War II were not political questions. *See Ungaro-Banages v. Dresdner Bank AG*, 379 F.3d 1227, 1235-37 (11th Cir. 2004).

In contrast, the district court in this case relied heavily on litigation in federal district courts in New Jersey in which the courts determined that various Holocaust claims raised non-justiciable political questions.[8] *See Burger-Fischer v. Degussa*

---

[7]In addition to Michael Bazyler's comprehensive review of Holocaust-era litigation, Burt Neuborne, counsel to various parties in Holocaust litigation, provides a helpful overview of the path of these cases. *See* Burt Neuborne, *Preliminary Reflections on Aspects of Holocaust-era Litigation in American Courts*, 80 Wash. U. L.Q. 795 (2002).

[8]The Holocaust Survivors argue that it was improper for the district court to rely on these out-of-circuit district court cases. Although these cases cannot be viewed as precedent, it certainly was not improper for the district court to reference them and consider analogous principles. *See Hart v. Massanari*, 266 F.3d 1155, 1169 (9th Cir. 2001) (acknowledging practice of considering out-of-circuit cases when ruling on a novel issue of law). The Holocaust Survivors further challenge the use of these cases as improper in light of *Deutsch*. *See* 324 F.3d at 713 n.11. In *Deutsch*, we did not, however, reject the New Jersey cases wholesale but rather criticized the district court for invoking the political question doctrine when all that was required was "the simple application of the requirements of a treaty to which the United States is a party." *Id.*

*AG*, 65 F. Supp. 2d 248 (D.N.J. 1999); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999).[9]

Other courts fielding Holocaust-era claims have skirted the political question doctrine. *See, e.g.*, *Garb v. Republic of Poland*, 72 Fed. Appx. 850, 855 n.1 (2d Cir. 2003), *vacated and remanded by* 124 S. Ct. 2835 (2004) (cautioning in remanding claims brought by Jews against defendant states and their instrumentalities that the district court's "necessary factual inquiry should be conducted with appropriate attention to separation-of-powers concerns, inasmuch as the conduct of foreign relations is delegated to the political branches, and the adjudication of claims that risk significant interference with foreign relations policy may raise justiciability concerns") (citations omitted); *Goldstein v. United States*, No. 01-0005, 2003 U.S. Dist. LEXIS 19266 (D.D.C. Apr. 23, 2003) (memorandum opinion) (failing to reach political question doctrine because claims were barred by the doctrine of sovereign immunity in suit by Hungarian Jews against the United States for failure to take action to prevent the deaths of Jews during World War II and for recovery of stolen assets); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 129 n.9 (E.D.N.Y. 2000) (explaining in case alleging French banks had failed to return assets seized during the Holocaust that the political question doctrine was "not even raised by the defendants here and [is] irrelevant to these facts in any event").

Still other courts have not reached the issue because the cases were settled prior to ruling on the defendants' motions to dismiss. *See In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164 (S.D.N.Y. 2000) (overseeing settle-

---

[9]Following the district courts' dismissals of *Burger-Fischer* and *Iwanowa*, the plaintiffs pursued expedited appeals to the Third Circuit Court of Appeals. Neuborne, *supra* note 7, at 815. The appeals were adjourned in light of the impending establishment of a foundation to handle claims against German companies, and the appeals were "ultimately voluntarily dismissed in May 2001 in connection with the establishment of the German Foundation." *Id.*

ment proceedings in case against Austrian banks); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000) (overseeing settlement proceedings in Swiss Bank litigation).

With these varied views as a backdrop, we turn to consideration of the Holocaust Survivors' claims.

## II.  DISCUSSION

On appeal, the Holocaust Survivors address the first, second, and sixth *Baker* tests. The Vatican Bank maintains that the Holocaust Survivors' claims present political questions under all of the *Baker* tests. Because any single test can be dispositive, we address each in our discussion. Just as significantly, while we agree with the district court that certain types of claims arising out of World War II are properly left to the political branches, we take a surgical approach rather than a broad brush in benchmarking the *Baker* formulations against the individual claims. It is incumbent upon us to examine each of the claims with particularity.

The dissent would have the political question doctrine remove from our courts "*all* matters that fall by their constitutional DNA into this sphere [of conduct involving foreign relations]." Dissent at 6705. This over-inclusive approach threatens to sweep all cases touching foreign relations beyond the purview of the courts—a practice warned against in *Baker*. *See* 369 U.S. at 210-11 ("Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry."). The Court's emphasis in *Baker* on "the necessity for discriminating inquiry into the precise facts and posture of the particular case," *id.* at 217, "is not merely hortatory," *McMellon v. United States*, 387 F.3d 329, 374 (4th Cir. 2004) (en banc) (Luttig, J., dissenting). We therefore decline from reflexively invoking the doctrine merely because the Holocaust Survivors' claims implicate

foreign relations and instead proceed with a discriminating inquiry.

We conclude that the claims for conversion, unjust enrichment, restitution, and an accounting[10] with respect to lost and looted property are not committed to the political branches (the "Property Claims"). Recovery for lost and looted property, however, stands in stark contrast to the broad allegations tied to the Vatican Bank's alleged assistance to the war objectives of the Ustasha, including the slave labor claims, which essentially call on us to make a retroactive political judgment as to the conduct of war (the "War Objectives Claims"). Such judgment calls are, by nature, political questions. With this bifurcation as a framework, we first address the Property Claims.

## A.  PROPERTY CLAIMS

None of the *Baker* formulations are inextricable from the Property Claims. Simply because a foreign bank is involved and the case arises out of a "politically charged" context does not transform the Property Claims into political questions. *See Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (holding

---

[10]The Holocaust Survivors are asking *the court* to order the Vatican Bank to provide the necessary information to conduct an accounting. This request contrasts with cases in which plaintiffs have asked courts to require *the political branches* to take action. *See, e.g.*, *Earth Island Inst. v. Christopher*, 6 F.3d 648, 653-54 (9th Cir. 1993) (denying request that the court compel the Secretary of State to initiate negotiations with foreign nations); *see also Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) ("Damage actions are particularly judicially manageable" whereas "the framing of injunctive relief may require the courts to engage in the type of operational decision-making . . . constitutionally committed to other branches."). It is an open question whether the Holocaust Survivors will be able to gain access to the information needed for an accounting without diplomatic intervention considering that "[a] full accounting of the events of the Ustasha period . . . has to be found in the archives of other nations and possibly the Vatican." Ustasha Treasury Report, *supra* note 3, at 154.

that political question doctrine did not bar adjudication of claims brought under the ATS against a Bosnian-Serb leader for committing genocide and other atrocities).

As these excerpts from the Complaint demonstrate, the Property Claims consist of garden-variety legal and equitable claims for the recovery of property:

- "Looted Assets" is defined in the Complaint as including, *inter alia*, "cash, securities, silver, gold, jewelry, businesses, art masterpieces, equipment and intellectual property" that were improperly taken by any person or entity acting in furtherance of the Nazi or Ustasha regime.

- The second largest apparel factory in Yugoslavia was confiscated from the family of plaintiff Fred Zlatko Harris, including "50 advanced industrial Singer sewing machines." The family's investment real estate, car, and motorcycle were also confiscated by Ustasha forces.

- The "Ustasha and Germans" looted property "valued by the Tito government in 1948 in excess of $1,500,000 in prewar dollars" from the textile manufacturing assets of plaintiff Allen Dolfi Herskovich's family.

- Plaintiff Desa Tomasevic Wakeman describes how "money and other belongings including gold" were taken from her mother and grandmother by Ustasha forces.

- The looted assets were collected from a wide geographic area, with "[t]he Ustasha Treasury contain[ing] plunder from Ukraine and assets seized from the Ustasha victims in Yugoslavia."

- The Complaint lists whether the Vatican Bank "improperly retained or converted looted assets" belonging to the Holocaust Survivors as one of the common questions of fact for the proposed class.

- The Vatican Bank was unjustly enriched by "receiv[ing] stolen property given to [it] by members of the Ustasha Regime." The Holocaust Survivors further seek restitution for their "goods and property" that the Vatican Bank "wrongfully used and profited from."

- The Holocaust Survivors request that the court direct the Vatican Bank "to return all identifiable property looted from Plaintiffs and received by Defendants" and pay "the value [plus interest] of any identified property deposited by, or looted from, Plaintiffs and received by Defendants."

## 1.   TEXTUALLY DEMONSTRABLE COMMITMENT

[3] Beginning logically with the first *Baker* test, we divine no explicit constitutional reference that is applicable to this case. *Cf. Gilligan v. Morgan*, 413 U.S. 1, 5-11 (1973) (noting the Constitution's explicit vesting of power in Congress to "organiz[e] . . . the Militia" in holding that a suit seeking to restrain the Governor's use of National Guard troops presented political questions). More often, however, "there are few, if any, explicit and unequivocal instances in the Constitution of this sort of textual commitment. . . . The courts therefore are usually left to infer the presence of a political question from the text and structure of the Constitution." *Nixon*, 506 U.S. at 240-41 (White, J., concurring). In *Nixon*, the Court undertook an expansive review of the history of the Impeachment Trial Clause in concluding that the language and structure of the Constitution textually commits impeachment determinations to the Senate. *Id.* at 233-36; *see also*

*Powell*, 395 U.S. at 520-48 (1969) (engaging in a similarly extensive review of the text and history behind the expulsion power in Article I, Section 5, to discern whether it grants Congress judicially unreviewable power to set qualifications of membership).

Here we are not faced with analyzing a specific clause of the Constitution but rather proceed from the understanding that the management of foreign affairs predominantly falls within the sphere of the political branches and the courts consistently defer to those branches. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 422 n.12 (2003) ("[I]n the field of foreign policy, the President has the 'lead role.' ") (quoting *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972)); *Oetjen*, 246 U.S. at 302 (emphasizing that the conduct of foreign relations is committed to the political branches and is not subject to judicial inquiry); *Mingtai Fire & Marine Ins. Co. v. United Parcel Service*, 177 F.3d 1142, 1144 (9th Cir. 1999) (quoting *United States v. Pink*, 315 U.S. 203, 222-23 (1942)) ("[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; [and] . . . the propriety of the exercise of that power is not open to judicial review."). Notwithstanding this general commitment of foreign relations to the political branches, in *Baker*, the Court cautioned that whether a court should defer to the political branches is a case-by-case inquiry because "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." 369 U.S. at 211.

Our inquiry is further based on the premise that, unlike some World War II-era claims, the Holocaust Survivors' claims are not expressly barred by treaty.[11] U.S. Const. art. II,

---

[11]The dissent suggests that the Treaty of Peace with Italy, Feb. 10, 1947, art. 75, 61 Stat. 1245, 1400-01, controls this case. *See* Dissent at 6709-10. This emphasis is misplaced. The treaty was concluded with Italy, not the Vatican. *See* Vatican Background Note, *supra* note 2 ("Lateran Pacts con-

§ 2, cl. 1 (granting the President the power to make treaties); *see, e.g.*, *In re World War II Era Japanese Forced Labor Litig.*, 114 F. Supp. 2d 939, 945 (N.D. Cal. 2000), *aff'd*, *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003), (determining that the 1951 Peace Treaty with Japan essentially precludes all claims arising out of actions taken by Japan and its nationals during World War II).

Nor are the Holocaust Survivors' claims against the Vatican Bank the subject of an executive agreement. *See Garamendi*, 539 U.S. at 415-16 ("Historically, wartime claims against even nominally private entities have become issues in international diplomacy, and three of the postwar settlements dealing with reparations implicating private parties were made by the Executive alone."); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) ("Crucial to our decision today is the conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement.").

In other circumstances, the Executive Branch has taken formal steps to intervene in certain claims arising out of the Holocaust. Most notably, the United States and Germany signed an executive agreement in July 2000 in which Germany agreed to enact legislation establishing a foundation (the "Foundation") to oversee the compensation of those "who suffered at the hands of German companies during the National Socialist era and World War II." Agreement Concerning the Foundation "Remembrance, Responsibility and

---

firming independence and sovereignty of The Holy See signed with Italy on February 11, 1929."). Further, as previously noted, because this case comes to us at the motion to dismiss stage, we must accept the Complaint's demarcation between the Vatican Bank, which is named as a defendant, and the Vatican, which is not named as a defendant. To the extent further discovery resolves the legal and political status of the Vatican bank vis-à-vis the Vatican and/or Italy, the treaty could have some bearing. At this juncture, however, it is not applicable to the claims as plead.

the Future," July 17, 2000, U.S.-F.R.G., 39 I.L.M. 1298, 1298 ("Foundation Agreement");[12] *see also Garamendi*, 539 U.S. at 405-08 (describing the Foundation Agreement and similar agreements concluded with Austria and France).

The Holocaust Survivors' case is distinguishable from those involving the Foundation in that there is no analogous executive agreement covering claims to the Ustasha treasury. Despite the dearth of formalized accords, the Vatican Bank counters—and the district court agreed—that the absence of an agreement covering the Holocaust Survivors' claims is not dispositive of the issue. We agree. The question then comes back to whether the Property Claims are the type of claims committed to the political branches for resolution.

[4] We do not have much guidance in evaluating the nature of the non-treaty, non-executive agreement claims. At bottom, the Property Claims simply seek restitution for looted assets belonging to purported class members. Reparation for stealing, even during wartime, is not a claim that finds textual commitment in the Constitution.

The Holocaust Survivors do not, for example, seek back rent due a New York landlord from a country whose diplo-

---

[12]Courts have been inconsistent as to whether the Foundation Agreement precludes private litigation. *Compare Ungaro-Banages*, 379 F.3d at 1235 (explaining in holding that the political question doctrine did not act as a bar that "the plain text of the Foundation Agreement anticipates that federal courts will consider claims against German corporations") *with In re Nazi Era Cases Against German Defendants Litig.*, 334 F. Supp. 2d 690, 696-97 (D.N.J. 2004) (holding claim against German company arising out of so-called Nazi "medical experiments" was nonjusticiable on the basis of "[t]he history of foreign policy commitments devoted to the resolution of Holocaust-era claims, coupled with the relatively recent creation of the Foundation"); *see also* Neuborne, *supra* note 7, at 824 n.101 ("[The] precatory Statement of Interest [called for in the Foundation Agreement] has no preclusive effect. It leaves to the discretion of an Article III court whether additional Holocaust-era litigation should be entertained.").

mats were expelled from the United States, *767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Fed. Republic of Yugoslavia*, 218 F.3d 152 (2d Cir. 2000), or request an asset freeze based on a declaration that the Communist Vietnam government is an enemy of the United States, *Can v. United States*, 14 F.3d 160 (2d Cir. 1994), or challenge the executive power under the Hostage Act, *Smith v. Reagan*, 844 F.2d 195 (4th Cir. 1988), or raise a claim contingent on the safety and effectiveness of a military exercise, *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997), or present claims arising out of the CIA's involvement in the anti-Allende coup in Chile, *Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), or question the recognition of a foreign government, *Antolok*, 873 F.2d at 379-85.

Instead, the claims here bear more similarities to the property claims considered by the Supreme Court last year in *Altmann*. *See* 124 S. Ct. at 2243. Altmann brought suit against Austria and its national art gallery seeking to recover six Klimt paintings that were allegedly wrongfully obtained by the gallery after Nazi forces seized them during World War II. *Id.* The Court granted certiorari on the limited question of whether the FSIA applies retroactively, *id.*, and did not address the political question doctrine. Nonetheless, that the Court allowed the case to proceed underscores that courts have a place in deciding Holocaust-era claims concerning looted assets. *Cf. Rosner v. United States*, 231 F. Supp. 2d 1202, 1204 (S.D. Fla. 2002) (denying motion to dismiss, in part, in case alleging that the United States seized valuables belonging to Hungarian Jews after World War II).

Significantly, the United States itself brought an action in federal district court in New York seeking civil forfeiture of a painting that the United States claimed was about to be exported in violation of the National Stolen Property Act. *See United States v. Portrait of Wally*, No. 99 Civ. 9940, 2002 U.S. Dist. LEXIS 6445 (S.D.N.Y. Apr. 12, 2002). "Wally," which was on loan from a museum in Austria, was taken from

victims of the Holocaust during World War II. *Id.* at *6. The court rejected Austria's argument, as amicus curiae, that the court should not hear the case because of the political question doctrine. *Id.* at *38 (determining that none of the six *Baker* formulations was present). Although the claim was in rem in nature, rather than for damages, the consideration under *Baker*'s first test is the same.

**[5]** As with *Portrait of Wally* and *Altmann*, the Property Claims ultimately boil down to whether the Vatican Bank is wrongfully holding assets. Deciding this sort of controversy is exactly what courts do. The presence of a foreign defendant with some relationship to a foreign government and claims stemming from World War II atrocities tinge this case with political overtones, but the underlying property issues are not "political questions" that are constitutionally committed to the political branches.

The dissent's rhetoric aside, the question here is whether the suit should be stopped dead because of the political question doctrine. If Judge Trott contests the broad jurisdiction of U.S. courts to hear suits involving foreigners, or the scope of the FSIA—issues that are not even presented at this stage of the proceeding—then his recourse is with Congress, not a quarrel with the majority. Our holding does not, as the dissent contends, "extend[ ] the concept of judicial authority into unknown territory and mistakenly exercise[ ] power and competence that plainly belongs to the President and to Congress." Dissent at 6715-16. Nor does it raise the spectre of a "World Court . . . with breathtaking and limitless jurisdiction to entertain the World's failures." Dissent at 6712. Rather, we hold true to a fundamental principle behind our separation of powers design, namely that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177. Because the Property Claims do not raise questions "entrusted to one of the political branches or involv[ing] no judicially enforceable rights,"

*Vieth*, 124 S. Ct. at 1776, we fulfill our duty to say what the law is.

### 2. JUDICIALLY DISCOVERABLE AND MANAGEABLE STANDARDS

The Supreme Court discussed the second *Baker* test at length last term in *Vieth*. The plurality explained that political gerrymandering claims are nonjusticiable because no judicially discernible and manageable standards for adjudicating such claims exist: "One of the most obvious limitations imposed by that requirement is that judicial action must be governed by *standard*, by *rule*." 124 S. Ct. at 1777. In response to Justice Kennedy's concern that the plurality's decision was premature,[13] Justice Scalia replied, "But it is the function of the courts to provide relief, not hope." *Id.* at 1791. The crux of this inquiry is thus not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint. Rather, courts must ask whether they have the legal tools to reach a ruling that is "principled, rational, and based upon reasoned distinctions." *Id.* at 1777.

In conducting this inquiry, the refusal of five Justices in *Vieth* to hold that no manageable standard existed despite what the plurality termed "[e]ighteen years of essentially

---

[13]Abiding by the rule that when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds," *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted), we treat the position enunciated in Justice Kennedy's concurrence as controlling. Although agreeing with the majority that the Court should refrain from intervention in the case at bar, Justice Kennedy declined to join the plurality in holding that all political gerrymandering claims are nonjusticiable. *Vieth*, 124 S. Ct. at 1793 (Kennedy, J., concurring) ("I would not foreclose all possibility of judicial relief if some limited and precise rationale were found to correct an established violation of the Constitution in some redistricting cases.").

pointless litigation," *id.* at 1792, counsels against holding a case nonjusticiable under the second *Baker* test without first undertaking an exhaustive search for applicable standards. *See id.* at 1795-96 (Kennedy, J., concurring) (calling for "err[ing] on the side of caution" in refraining from concluding that no manageable standards will emerge in the future). As Justice Ginsburg optimistically wrote, although "courts have been trying to devise practical criteria for political gerrymandering for nearly 20 years" without reaching a workable solution, "I do not accept it as sound counsel for despair." *Id.* at 1815-16 (Ginsburg, J., dissenting).

The district court determined that the second *Baker* test required dismissal, explaining that the Holocaust Survivors' case presents "intractable problems," including the task of identifying and notifying potential class members, the "multitude of sources" from which relevant materials would be gathered, and the likelihood that the parties would be able to gather all of the "pertinent data." It is not surprising that the district court zeroed in on "manageable standards" for deciding the case. The *Baker* language is not crystal clear in this regard and, understandably, other courts have similarly focused on case management. *See, e.g.*, *Iwanowa*, 67 F. Supp. 2d at 488-89 ("[T]he relevant materials come from a multitude of sources, which . . . are voluminous and potentially unmanageable for individual courts to handle.")

Lest there be any doubt, *Vieth* refines and redirects the inquiry. In light of the Court's clarification in *Vieth*, we take a slightly different approach to interpreting the phrase "judicially discoverable and manageable standards." Instead of focusing on the logistical obstacles, we ask whether the courts are capable of granting relief in a reasoned fashion or, on the other hand, whether allowing the Property Claims to go forward would merely provide "hope" without a substantive legal basis for a ruling. *See Vieth*, 124 S. Ct. at 1791. We conclude that there are sound bases for providing relief.

The Holocaust Survivors' most straightforward claims involve identifiable personal property for which federal statutes, common law, state law, and well-established case law provide concrete legal bases for courts to reach a reasoned decision. *See, e.g.*, 28 U.S.C. § 1605(a)(3) (providing an expropriation exception to sovereign immunity in certain cases involving "rights in property taken in violation of international law"); *Altmann*, 124 S. Ct. at 2245 (asserting jurisdiction under the FSIA's expropriation exception for return of artwork taken by Nazi forces); *Gruber v. Pac. States Sav. & Loan Co.*, 88 P.2d 137, 139 (Cal. 1939) ("It is settled that conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.").

**[6]** *Altmann* involved six paintings that were linked to a single plaintiff through an imperfect, but at least fairly well documented, chain of ownership. More difficult is tracking gold, silver, and other fungible assets, like money, especially those without bank account records or other reliable documentation. We are well aware that the Holocaust Survivors have a difficult task ahead of them in establishing the path that the looted funds followed. *See* Ustasha Treasury Report, *supra* note 3, at 154-55 ("The Croatian delegation [at the London Conference on Nazi Gold held in December 1997] stated that there were 22 lists specifying the gold [of the Ustasha], but the lists have not been found, and further documentation regarding the gold was assumed to be with the National Bank of Yugoslavia."); *id.* at 155 ("There is some evidence that at least part of the Croat Foreign Ministry archives was sent to the Vatican at the end of the War."). These looming evidentiary and proof obstacles do not change the fact that, at heart, the Holocaust Survivors seek compensation for stolen property, a claim that is very familiar in our courts. *Cf. Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991) (concluding that the second *Baker* test did not act as a bar in case against the Palestine Liberation Organization "because the

common law of tort provides clear and well-settled rules on which the district court can easily rely").

It would be premature for us to foreclose the Holocaust Survivors' claims because of such impending hurdles: The second *Baker* prong is not a proxy for the class certification analysis. *See* Fed. R. Civ. P. 23. As with every prospective class action, this one must pass through the Rule 23 filter, a process that could preclude the class or perhaps result in the reshaping of the class or in some other modification of the dispute. Concerns about class composition and size, as well as questions about access to relevant documents, should be left to Rule 23 proceedings and the discovery process.

Accordingly, the district court was misplaced in its reliance on the somewhat anachronistic *Kelberine v. Societe Internationale*, 363 F.2d 989 (D.C. Cir. 1966), to support the view that the Holocaust Survivors' claims present "intractable problems" that defy manageable judicial resolution. In *Kelberine*, the District of Columbia Circuit affirmed the dismissal of World War II-era claims against a Swiss holding corporation "for failure to state a claim upon which relief can be granted." 363 F.2d at 995. Without mentioning the political question doctrine, the court explained, "The procedure sought —adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power—is too complicated, too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed." *Id.* Most significantly, *Kelberine* does not address the second *Baker* test. Nor can *Kelberine* serve as a guide to logistical infringement.

Since *Kelberine* was decided in 1966, the class action landscape has changed dramatically. Coincidentally, this same year marked the emergence of "modern class action practice," *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833 (1999), with the "innovative 1966 revision" to Rule 23, *Amchem Prods., Inc.*

*v. Windsor*, 521 U.S. 591, 613 (1997). *Kelberine* was also decided prior to creation of the Manual for Complex Litigation which, first published in 1969, is now in its fourth incarnation. *See* Fed. Judicial Ctr., Manual For Complex Litigation, Fourth (2004). This manual offers "an array of litigation management techniques and procedures," and recognizes that due to the presence of much "sparsely charted terrain[,] . . . judges are encouraged to be innovative and creative to meet the needs of their cases." *Id.* at 2-3.

While acknowledging the innovative and creative means that the judiciary has employed to tackle class actions, we are well aware that this is a behemoth of a case. Even so, courts have repeatedly risen to the challenge of handling cases involving international elements as well as massive, complex class actions. *See generally* Kenneth R. Feinberg, *Reporting From the Front Line — One Mediator's Experience With Mass Torts*, 31 Loy. L.A. L. Rev. 359, 371 (1998) (discussing "some of the practical problems which arise in attempting to resolve [mass tort] litigation and the pragmatic solutions offered to deal with these problems"). Courts also have fashioned innovative solutions to surmount similar obstacles in the Holocaust-claims context. *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 82 (2d Cir. 2001) (explaining in class action against German and Austrian banks that "the notice campaign also utilized newspaper advertisements, direct mailing to organizations throughout the world, and a world wide web home page"); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d at 147 (noting in context of reviewing settlement agreement that "some 550,000 Initial Questionnaires had been received from class members worldwide"). Our conclusion that this case is judicially "manageable" does not diminish our understanding that burdening a district court with a case of this magnitude and complexity may prove to present a Sisyphean task: Just when the court appears to be making progress towards reaching legal peace, the rock rolls back down and the court must tackle the next issue.

**[7]** The Holocaust Survivors unrealistically "anticipate that there will be no difficulty in the management of this litigation." Of course there will be litigation management difficulties, but that does not mean that courts "lack . . . judicially discoverable and manageable standards" for resolving the Property Claims. *Baker*, 369 U.S. at 217. Concerns about class certification, discovery, and allocation, among other issues, are matters to be resolved at a later time. Today we conclude only that a legal framework exists by which courts can evaluate these claims in a reasoned manner.

**Volume 2 of 2**

### 3. INITIAL POLICY DETERMINATION

**[8]** Nor do we think that adjudicating the Property Claims will be impossible "without [making] an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. The Property Claims focus on the extent to which the Holocaust Survivors were wrongfully deprived of personal property and the value of such property that was transferred to the Vatican Bank. Adjudicating these discrete issues will not require the court to make pronouncements on foreign policy or otherwise trigger the third *Baker* test. *Cf. Aktepe*, 105 F.3d at 1404 (wrongful death claims arising out of a NATO training exercise raised nonjusticiable political questions in part because a decision would require "a policy determination regarding the necessity of simulating actual battle conditions").

### 4. LACK OF RESPECT FOR COORDINATE BRANCHES

The fourth *Baker* test requires us to consider whether it would be impossible for the courts to resolve the Property Claims without expressing a lack of respect for the political branches. *See Baker*, 369 U.S. at 217. As evidenced by the Vatican's protest to the State Department, this case implicates foreign relations. Whether the court's involvement would inevitably express a lack of respect for the Executive Branch's handling of U.S.-Vatican relations,[14] as well as relations with other foreign states, is a separate matter.[15] We conclude that judicial handling of the Property Claims will not run afoul of this fourth test.

---

[14]The United States and the Vatican established diplomatic relations on January 10, 1984. Vatican Background Note, *supra* note 2.

[15]In addition to relations with the Vatican, we recognize that, theoretically, this case could bear on the United States' relationship with Croatia, as well as other countries. But this theoretical possibility—even if common sense—does not dictate the confines of a political question.

More than four years have passed since the Vatican sent its protest to the State Department. The Holocaust Survivors represented to the court that the State Department has been apprised of this appeal but has said that its decision not to intervene is not reflective of its view on the merits of this case.

**[9]** Had the State Department expressed a view, that fact would certainly weigh in evaluating this fourth *Baker* formulation. In *Altmann*, the Court explained that "should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy." 124 S. Ct. at 2255 (footnote omitted); *see also* 28 U.S.C. § 517 ("The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States . . . ."). It is unclear, however, how courts should construe executive silence. We are not mind readers. And, thus, we cannot discern whether the State Department's decision not to intervene is an implicit endorsement, an objection, or simple indifference. At best, this silence is a neutral factor.

A few weeks after *Altmann* was decided, the Supreme Court considered "a policy of case-specific deference to the political branches" as a possible limitation on the determination whether an international norm is sufficiently definite to support a cause of action. *Sosa*, 124 S. Ct. at 2766 n.21. The Court saw no need to apply this policy in *Sosa*. Nonetheless, the Court pointed to "several class actions" pending in federal district court seeking damages from corporations in connection with South Africa's former apartheid regime. *Id.* (citing *In re South African Apartheid Litig.*, 238 F. Supp. 2d 1379 (J.P.M.L. 2002) (granting a motion to transfer the cases to the Southern District of New York)). In the South Africa cases,

the State Department filed a statement in support of South Africa's position that the cases interfered with the policy embodied by its Truth and Reconciliation Commission. 124 S. Ct. at 2766 n.21. The Court concluded, "In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.*

Such case-specific intervention is not uncommon in cases involving foreign affairs. *See Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1179-80 (C.D. Cal 2002) (listing numerous examples where the Executive Branch submitted its opinion in cases involving foreign affairs). In the Holocaust-era claims context, the United States agreed as part of the Foundation Agreement that whenever a German company was sued in a U.S. court over a Holocaust-era claim, the U.S. Government would submit a statement that foreign policy interests recommend recognition of the Foundation as the exclusive forum for such claims and "that U.S. policy interests favor dismissal on any valid legal ground." Foundation Agreement, 39 I.L.M. at 1304. The United States stopped short, however, of expressly precluding all claims. *See Garamendi*, 539 U.S. at 436 (Ginsburg, J., dissenting) ("The [Foundation] agreement makes clear, however, that 'the United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal.' ") (quoting Foundation Agreement, 39 I.L.M. at 1304). Courts have varied in their interpretation of the amount of deference these statements merit. *Compare Ungaro-Benages*, 379 F.3d at 1236 n.12 (statement of interest filed by U.S. Government under the Foundation Agreement is "entitled to deference, [but] does not make the litigation non-justiciable") *with Frumkin v. JA Jones, Inc. (In re Nazi Era Cases Against German Defendants Litig.)*, 129 F. Supp. 2d 370, 388-89 (D.N.J. 2001) ("If [the statement of interest filed by U.S. Government under the Foundation Agreement] does not clearly demonstrate that the claims against German Industry presently before the Court constitute political questions best

left to the political branches, it is unclear to the Court what would."). Here, we are not even faced with evaluating the State Department's position because the Department has issued no statement in this case.

**[10]** Nor does allowing the Holocaust Survivors' claims to proceed mean that the political branches will be shut out from having any input as the case develops. As a State Department Deputy Legal Adviser explained: "Whether the U.S. Government agrees to facilitate the resolution of [future Holocaust-era disputes that are between private parties], will be, I think, a case-by-case decision, based on a judgement of the United States government interests involved in the circumstances presented." Ronald J. Bettauer, The Role of the United States Government In Recent Holocaust Claims Resolution, Keynote Address at the Stefan A. Riesenfeld Symposium 2001 (Mar. 8-9, 2001), *in* 20 Berkeley J. Int'l L. 1, 10 (2002). Such government involvement is not limited to a specified period during the judicial process, such as the motion to dismiss stage. *Cf. Kadic*, 70 F.3d at 250 (describing statement of interest filed by the government after oral argument on appeal). Accordingly, going forward, we respect the political branches' right to weigh in and to play a role in the resolution of the Holocaust Survivors' claims. *See generally* Neuborne, *supra* note 7, at 796 (analogizing process of resolving Holocaust-era claims to a "three-legged stool" made up of class action litigation, diplomacy, and community involvement). Given the Executive Branch's continuing silence on the Holocaust Survivors' claims, however, we follow *Sosa*'s lead that at this time "we need not apply here . . . a policy of case-specific deference to the political branches." 124 S. Ct. at 2766 n.21.

This case will proceed with foreign relations considerations as a backdrop, and the district court should and "can consider the nation's foreign policy interests and international comity concerns in [its] decisions." *Ungaro-Banages*, 379 F.3d at 1237; *see also Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 65

(D.D.C. 2004) (refusing to dismiss case but commenting that the court "will carefully construct the future course of this proceeding" bearing "concerns founded in the principles of the political question, separation of powers, and act of state doctrines firmly in mind"). Despite these delicate considerations, the district court is fully capable of resolving the Property Claims without expressing a lack of respect for the political branches.

### 5.  ADHERENCE TO A POLICY DECISION

**[11]** We see no concern that judicial handling of the Property Claims will involve "an unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217; *cf. Klinghoffer*, 937 F.2d at 50 (concluding that the fifth *Baker* test did not bar adjudication "because no prior political decisions are questioned—or even implicated—by the matter before us"). Indeed, this case is before us not because the Holocaust Survivors disagree with a political decision made regarding their claims, but rather because there simply has been no decision. *See Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1047 (9th Cir. 1983) (adjudicating case would not require the court to "challenge the wisdom or legality of any governmental act or decision"). Because of the lack of a policy decision on point, we do not reach the question posed by the fifth *Baker* test whether there is an "unusual need for unquestioning adherence" thereto. *Baker*, 369 U.S. at 217.

### 6.  MULTIFARIOUS PRONOUNCEMENTS

**[12]** The only question remaining is whether adjudicating the Property Claims would "cause the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217; *see also Japan Whaling Ass'n.*, 478 U.S. at 230 (rejecting argument that the Court should defer adjudication on the basis of the sixth *Baker* test). On the contrary, this case is marked by

the absence of "pronouncements" by the political branches regarding the resolution of claims to the Ustasha treasury.

We reject the Vatican Bank's argument that despite this vacuum, any adjudication of the Holocaust Survivors' claims would cause potential embarrassment because it would be inconsistent with the political branches' stated intent to resolve claims arising out of World War II by way of inter-governmental negotiations and diplomacy. *See Garamendi*, 539 U.S. at 421 (explaining that the "consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions").

**[13]** We are mindful of stepping on the toes of the political branches, but we disagree that *any* adjudication of the claims would implicate this final test. As discussed with regard to the War Objectives Claims, the district court should refrain from hearing those claims that require passing judgment on foreign policy decisions. On the other hand, fulfilling our constitutionally-mandated role to hear controversies properly before us does not threaten to cause embarrassment or multiple pronouncements. *Cf. Johnson v. Collins Entm't Co.*, 199 F.3d 710, 729 (4th Cir. 1999) (Luttig, J., concurring in the judgment) ("If the Congress sees fit to provide citizens with a particular cause of action, then we as federal courts should entertain that action—and unbegrudgingly.").

In the landscape before us, this lawsuit is the only game in town with respect to claimed looting and profiteering by the Vatican Bank. No ongoing government negotiations, agreements, or settlements are on the horizon. The outside chance that the Executive Branch will issue a statement in the future that has the "potentiality of embarrassment" when viewed against our decision today does not justify foreclosing the Holocaust Survivors' claims, especially when "[t]he age and health of many of the class members also presses for a prompt

resolution." *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d at 148.

**[14]** In sum, none of the *Baker* formulations is "inextricable" from the Property Claims. *See Baker*, 369 U.S. at 217. The Holocaust Survivors have presented a justiciable controversy.[16]

## B.   WAR OBJECTIVES CLAIMS

In contrast to the Property Claims, the Holocaust Survivors' allegations that "[t]he actions and conduct of Defendants, in addition to being profitable, actively assisted the war objectives of the Ustasha Regime" strike at the heart of the Ustasha's wartime conduct. The Holocaust Survivors catalog a litany of claimed international law violations:

- "Defendants knowingly facilitated and aided and abetted the activities of war criminals . . . . Defendants created a 'ratline' or 'pipeline' to help the war criminals flee from prosecution."

- "Defendants . . . by assisting the Nazi backed Ustasha Regime in preserving their Treasury for the purpose of continuing a Government in Exile . . . and evading justice for genocidal war crimes[,] . . . committed war crimes, crimes against peace and crimes against humanity . . . ."

- "The [Vatican Bank] abused its position as the

---

[16]Despite the dissent's protest that "[t]his is *not* our 'game,' period," Dissent at 6705, the Constitution does not relegate us to the sidelines. We are a player in adjudicating claims, and a crucial one at that. Abdicating that role and reflexively tossing the ball into the political branches' court without the requisite analysis of the individual claims would be tantamount to shirking our "obligation[ ] to decide cases and controversies properly presented to [us]." *W.S. Kirkpatrick & Co.*, 493 U.S. at 409.

Papal bank of Vatican City by a clear pattern of violation of diplomatic norms . . . ."

- "Serbs, Jews, and the Roma were slaughtered in their villages after unspeakable tortures or burned alive in their churches. . . . Many were used as slave laborers. The remaining people were taken to concentration camps where the majority perished."

- "Jasenovac Concentration Camp complex . . . was the home of indescribable brutality . . . . Not only were inmates butchered but slave and forced labor was performed for the benefit of the Ustasha regime."

These claims, which we have denominated as the "War Objectives Claims," present a nonjusticiable political question.

**[15]** It is axiomatic that the Constitution vests the power to wage war in the President as Commander in Chief, U.S. Const. art. II, § 2, cl. 1, and the ability to "seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war" is "an important incident to [this power]." *Ex parte Quirin*, 317 U.S. 1, 28-29 (1942); *Doe v. Bush*, 323 F.3d 133, 137 (1st Cir. 2003) ("The Constitution reserves the war powers to the legislative and executive branches."). A plurality of the Supreme Court recently reaffirmed that the judicial branch "accord[s] the greatest respect and consideration to the judgments of military authorities in matters relating to the actual prosecution of a war, and recognize[s] that the scope of that discretion necessarily is wide." *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2649 (2004).[17] Wartime context aside, as discussed pre-

---

[17]We stress, however, that courts are not powerless to review the political branches' actions during wartime for, as the plurality cautioned in

viously, "cases interpreting the broad textual grants of authority to the President and Congress in the areas of foreign affairs leave only a narrowly circumscribed role for the Judiciary." *Made in the USA Found.*, 242 F.3d at 1313.

Following World War II, the Executive Branch exercised its authority in a number of ways, including through the Nuremberg Trials, which included prosecution for "murder, extermination, enslavement, [and] deportation" among other crimes against humanity, war crimes, and crimes against peace. Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1546, 1547, 82 U.N.T.S. 279 ("Nuremberg Charter"). *See generally* Steven Fogelson, Note, *The Nuremberg Legacy: An Unfulfilled Promise*, 63 S. Cal. L. Rev. 833 (1990). Simply because the Nuremberg Charter does not expressly preclude national courts from trying war criminals, Nuremberg Charter, *supra*, 59 Stat. at 1545, does not mean that it is our place to step in a half-century later and condemn the Vatican Bank and related parties for "participat[ing] in the activities of the Ustasha Regime in furtherance of the commission of war crimes, crimes against humanity, [and] crimes against peace." We are not a war crimes tribunal. To act as such would require us to "intrud[e] unduly on certain policy choices and value judgments that are constitutionally committed to [the political branches,]" *Koohi*, 976 F.2d at 1331, for we do not and cannot know why the Allies made the policy choice not to prosecute the Ustasha and the Vatican Bank. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) (acknowledging that "the 'nuances' of 'the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court' ") (quoting *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)).

*Hamdi*, "Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi*, 124 S. Ct. at 2650.

Indeed, the Holocaust Survivors' allegations that the Vatican Bank violated international law by "creat[ing] a 'ratline' or 'pipeline' to help the war criminals flee from prosecution" could also be levied against the United States, which provided similar aid driven by the sudden shift in priorities from fighting the Nazis to driving back Communism:

> [The College of San Girolamo in Rome] helped fugitive Croatian war criminals escape to the Western Hemisphere in the early postwar years, and cooperated with the "rat line" being used by the U.S. Army Counter Intelligence Corps after the War to assist the escape from Europe of anti-Communists. The fact that the "rat line" later facilitated the escape even of a Nazi war criminal like Klaus Barbie underscores the shift in the Allies' attitudes: World War II was over; the Cold War was on.

Ustasha Treasury Report, *supra* note 3, at xviii. The United States has acknowledged that "conflicting priorities on the part of the Allies—particularly the need to rebuild a war-torn Europe and assemble a Western coalition against Soviet aggression with the onset of the Cold War—led to an insufficient recovery of looted gold and other assets." *Id.* at iv. It is not our role to sit in judgment as to whether the perceived Communist threat justified assisting alleged war criminals. Rather, we are mindful of the Supreme Court's admonition that it is up to the political branches to come to terms with these "delicate [and] complex" foreign policy decisions "for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

Whether the Holocaust Survivors' claims related to slave labor are justiciable is a more nettlesome question. The exact nature of the slave labor claims against the Vatican Bank is

not entirely clear from the Complaint. The Holocaust Survivors allege that class members share a common question of fact whether "Defendants were directly and/or indirectly involved with the . . . conversion of . . . Plaintiffs' labor" and further allege that "Defendants have failed to . . . pay to Plaintiffs . . . the value of slave labor performed." Although the Complaint maintains that many of the Ustasha officials were Roman Catholic clergy, it does not indicate that the Vatican Bank itself directly exploited the slave labor. Unlike cases in which the defendants were the enslaving entities, the slave labor claims against the Vatican Bank are, in effect, derivative claims: The Ustasha profited from slave labor, these profits benefitted the Ustasha treasury, and portions of these tainted funds were transferred to the Vatican Bank. *Cf. Deutsch*, 324 F.3d at 704 (plaintiffs "were forced to work as slaves" for defendant corporation); *Iwanowa*, 67 F. Supp. 2d at 431 (defendants forced plaintiffs "to perform forced labor under inhuman conditions").

[16] Determining whether the Vatican Bank was unjustly enriched by profits derived from slave labor would therefore necessitate that we look behind the Vatican Bank and indict the Ustasha regime for its wartime conduct.[18] We are not willing to take this leap. Condemning—for its wartime actions—a foreign government with which the United States was at war would require us to "review[ ] an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been 'constitutional[ly] com-

---

[18]In rejecting the Holocaust Survivors' slave labor claims, we distinguish profits derived from slave labor from those derived from investing seized assets. In the former case, the court would need to evaluate the Ustasha's wartime use of slave labor, quantify the monetary value of this labor, and then determine the portion thereof that flowed to the Vatican Bank. In contrast, if the Holocaust Survivors can surmount the daunting evidentiary obstacles and establish that seized assets came to rest with the Vatican Bank, then the Property Claims could encompass both the value of the assets themselves as well as any profits earned by the Vatican Bank from the subsequent investment of the seized assets.

mit[ted].' " *Goldwater*, 444 U.S. at 1006 (Brennan, J., dissenting) (quoting *Baker*, 369 U.S. at 217); *cf. Linder v. Portocarrero*, 963 F.2d 332, 337 (11th Cir. 1992) (holding in case involving the murder of an American by the Nicaraguan Contras that "the broad allegations . . . which comprise the entire military and political opposition in Nicaragua, are non-justiciable").

**[17]** This determination that the slave labor claims run afoul of the first *Baker* test is reinforced by the third *Baker* test, which asks whether the issue can be decided "without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. It is not our place to speak for the U.S. Government by declaring that a foreign government is at fault for using forced labor during World War II. Any such policy condemning the Ustasha regime must first emanate from the political branches.

Our conclusion that the slave labor claims are not justiciable comports with our decision in *Deutsch*. The two cases are superficially similar in that they address the same general subject matter of Holocaust-era slave labor claims. In *Deutsch*, however, we based our holding on federal-state relations rather than separation of powers concerns.[19] 324 F.3d at 705-16. And, unlike this case where there are no treaties on point, we emphasized in *Deutsch* that "the United States resolved the war against Germany by becoming a party to a number of treaties and international agreements." *Id.* at 712 n.15. Consequently, although in both cases we reach the same ultimate conclusion that the slave labor claims cannot proceed, we do so here because adjudicating these claims would entail med-

---

[19]The district court in *Deutsch* dismissed the action as presenting a non-justiciable political question. *See Deutsch*, 324 F.3d at 705 (citing *Deutsch v. Turner*, No. CV 00-4405 (C.D. Cal. Aug. 25, 2000)). On appeal, we disagreed with the court's application of the doctrine on the basis that the mere application of treaties concluded with Germany did not raise a political question. 324 F.3d at 713 n.11.

dling in matters reserved to the political branches and not because this result is compelled by treaties.

Nor does our decision conflict with the Second Circuit's reasoning in *Kadic*, a case which, in addition to geographic parallels, involved claims tied to similar genocidal acts. *See* 70 F.3d at 236-37. In *Kadic*, Croats and Muslims brought suit against Radovan Karadzic under the ATS alleging that he oversaw the genocidal campaign conducted by Bosnian-Serb military forces. *Id.* In holding that the claims were not barred by the political question doctrine, the court cautioned that "judges should not reflexively invoke the[ ] doctrine[ ] to avoid difficult and somewhat sensitive decisions in the context of human rights." *Id.* at 249. We agree. Unlike in *Kadic*, however, we think that "weigh[ing] carefully the relevant considerations" at stake in this particular case, adjudicating the slave labor claims in the context presented here would "compromis[e] the primacy of the political branches in foreign affairs." *Id.* Not only did the State Department "expressly disclaim[ ] any concern that the political question doctrine should be invoked" in *Kadic*, *id.* at 250, but the claims in *Kadic* focused on the acts of a single individual during a localized conflict rather than asking the court to undertake the complex calculus of assigning fault for actions taken by a foreign regime during the morass of a world war. The slave labor claims present no mere tort suit. On the contrary, these claims fundamentally rest on "controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n*, 478 U.S. at 230.

**[18]** Our decision to affirm the district court's dismissal of the War Objectives Claims is not a result we reach lightly.[20]

---

[20]We caution that our holding does not signify that slave labor claims automatically raise issues that are committed to the political branches. As with all claims, this determination must be based on the circumstances of

We do not wish to imply in the slightest that these claims do not represent gravely serious harms for which the Holocaust Survivors deserve relief. The difficulty is that relief lies elsewhere. As the court observed in *In re Austrian and German Bank Holocaust Litigation*, "Those persecuted by the Nazis were the victims of unspeakable acts of inhumanity. At the same time, however, it must be understood that the law is a tool of limited capacity. Not every wrong, even the worst, is cognizable as a legal claim." 80 F. Supp. 2d at 177. In this case, the Holocaust Survivors must look to the political branches for resolution of the War Objectives Claims which, at base, are political questions.

## III.  Conclusion

We REVERSE the district court's grant of the Vatican Bank's motion to dismiss with regard to the Holocaust Survivors' Property Claims for conversion, unjust enrichment, restitution, and an accounting. We AFFIRM the district court's grant of the Vatican Bank's motion to dismiss with regard to all other claims in the Complaint, specifically the War Objectives Claims. We also AFFIRM the district court's order dismissing the action against the Croatian Liberation Movement for lack of personal jurisdiction.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED. Costs shall be awarded to appellants.

---

TROTT, Circuit Judge, concurring in part, and dissenting in part:

It is unlikely that a better case could be made for the majority's view that some of these matters are justiciable than the

the particular case. *See, e.g.*, *In re African-American*, 304 F. Supp. 2d at 1056-60 (concluding that slave reparation claims were not justiciable in part because "reparations to former slaves following the Civil War[ ] was considered and rejected by the Representative Branches").

one made by Judge McKeown in her well written opinion. Nevertheless, and with all due respect to my esteemed colleagues, I find part of their analysis unconvincing. In the main, the segregation for analytical purposes of the plaintiffs' claims into two distinct groups — "Property Claims" as distinguished from "War Objective Claims" — splits the atom where it is not divisible. In this respect, I agree with the defendants/appellees: "*All* claims asserted by plaintiffs are 'inextricably intertwined' with the Executive Branch's powers over war-related crimes, such that the judiciary is powerless to adjudicate them." Accordingly, although I agree that the so-called War Objective Claims are not justiciable, I respectfully dissent as to the others.

I concur in and adopt the district court's view that appellants' complaint unmistakably and inextricably raises issues that our Constitution commits to the legislative and executive branches of our government, not to the judiciary. *Alperin v. Vatican Bank*, 242 F. Supp. 2d 686 (N.D. Cal. 2003). This case fatally falls into at least two of the off-limits political question categories — defined as "formulations" — in *Baker v. Carr*, 369 U.S. 186, 217 (1962): (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" and (2) "a lack of judicially discoverable and manageable standards for resolving it." *Id.*

# I

As to the primary formulation — a constitutional commitment of the issue to a political department — the record compels us to take our lead from Chief Justice Marshall who said that "[q]uestions, in their nature political, or which are, by the Constitution and laws, submitted to the executive, can *never* be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) (emphasis added). The *Baker* court repeated this "clearly settled" principle, which emanates from our Constitution's careful allocation and separation of powers between our three branches, and in so doing identified "for-

eign relations" as one of the areas in which nonjusticiable political questions routinely arise, citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918): "The conduct of the foreign relations of our Government is committed by the Constitution to the executive and legislative — 'the political' — departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Baker*, 369 U.S. at 211 n. 31. In elaboration of this doctrine, the *Oetjen* court said,

> The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly "imperil the amicable relations between governments and vex the peace of nations."

246 U.S. at 303-04.

One of the earliest cases involving the respective authority of courts and Congress appears to be *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818), a case involving *inter alia* a robbery committed on the high seas by a non-citizen on board a ship belonging exclusively to subjects of a foreign state. The Court held (1) that a specific act of Congress criminalizing piracy did not give authority to our federal courts to take cognizance of, try, and punish such an act on the high seas as robbery, and (2) that the courts are not empowered to so act without authority from Congress. *Id.* at 633-35. In explanation of this decision, Chief Justice Marshall said,

Those questions which respect the rights of a part of a foreign empire, which asserts, and is contending for its independence, and the conduct which must be observed by the courts of the union towards the subjects of such section of an empire who may be brought before the tribunals of this country, are equally delicate and difficult.

As it is understood that the construction which has been given to the act of Congress, will render a particular answer to them unnecessary, the court will only observe, that such questions are generally rather political than legal in their character. *They belong more properly to those who can declare what the law shall be; who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise; to whom are entrusted all its foreign relations; than to that tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it.* In such contests a nation may engage itself with the one party or the other — may observe absolute neutrality — may recognize the new state absolutely — or may make a limited recognition of it. The proceeding in courts must depend so entirely on the course of the government, that it is difficult to give a precise answer to questions which do not refer to a particular nation. It may be said, generally, that if the government remains neutral, and recognizes the existence of a civil war, its courts cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy. To decide otherwise, would be to determine that the war prosecuted by one of the parties was unlawful, and would be to arrange the nation to which the court belongs against that party. *This would transcend the limits prescribed to the judicial department.*

*Id.* at 634-35 (emphasis added).

The Court registered a similar observation in *Foster v. Neilson*:

> In a controversy between two nations concerning national boundary, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own government. There being no common tribunal to decide between them, each determines for itself on its own rights, and if they cannot adjust their differences peaceably, the right remains with the strongest. *The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments of the nation have established.*

27 U.S. (2 Pet.) 253, 307-08 (1829), *overruled on other grounds by United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833) (emphasis added).

The Supreme Court has spoken frequently about this issue, and each time it has reiterated the structural and prudential proposition that the "President also possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs." *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948). Accordingly, the Court has made it clear that

> the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor

responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Id.* 333 U.S. at 111. *See also Schroeder v. Bush*, 263 F.3d 1169, 1175 (10th Cir. 2001).

Parenthetically, unlike the majority, I read this principle to include *all* matters that fall by their constitutional DNA into this sphere, whether the political branches have done anything about them or not. With all respect to my valued colleagues, I see it as a mistake to measure this issue of justifiability by a "this lawsuit is the only game in town" standard. This is *not* our "game," period, and we do not become vested with jurisdiction by default of the other branches. The majority opinion indicates that Executive silence is somehow relevant. I humbly disagree. The silence of another Branch cannot give us jurisdiction we do not otherwise have. The non-existence of an executive agreement is meaningless.

Notwithstanding appellants' lawyers' ability to cast this dispute in "garden-variety" legal terms, i.e., conversion, unjust enrichment, restitution, etc., the ineffable fact remains that this functionally is a lawsuit against (1) the Vatican itself, (2) the Vatican Bank, which is an instrumentality of the sovereign state of the Vatican, and (3) untold others — including probably the Pope — seeking relief for World War II wrongs against foreigners committed by the Nazis and their allies in Europe almost sixty years ago. As Judge Debevoise said in *Burger-Fischer v. DeGussa AG*, 65 F. Supp. 2d 248, 281 (D.N.J. 1999), "It is not accurate to characterize the present actions as simply [typical] controversies between private parties." Much more is clearly at stake. Stripped to its essentials, this is a derivative lawsuit against a sovereign seeking "reparations" for injuries and losses suffered during wartime at the hands of the Nazis and their alleged accomplices. As acknowledged by the majority, the Vatican has filed a note of protest and asked our State Department to intervene. This set

of facts and circumstances involving a foreign sovereign strikes me as demanding a "single-voiced statement" of our government's views, not a series of judgments by our courts. *Baker*, 369 U.S. at 211. I conclude, therefore, that the foreign policy quintessence of this case renders it as a subject matter beyond the power of the judiciary to intrude or to inquire.

Judge Greenaway's astute analysis in *Iwanowa v. Ford Motor Company*, 67 F. Supp. 2d 424, 485 (1999) is apposite:

> The executive branch has always addressed claims for reparations as claims between governments. Historically, at the end of a war, there has always been a declaration of victorious nations and defeated nations. As part of that process, the victorious nations invariably discuss the reparations that the defeated nations must pay to compensate the prevailing countries and their nationals for the loss that the aggressor country has caused. The nature of war is such that the governments of the victorious nations determine and negotiate the resolution of the claims of their nationals by way of agreements between the nations involved or affected by the war. This is evident from the reparations provisions in the Treaty of Versailles following World War I, and the discussion of reparations in the Yalta Conference, the Potsdam Conference and the Paris Reparations Treaty at the end of World War II. More recently, at the end of the Gulf War, the United Nations established an international claims resolution tribunal to resolve claims against Iraq. *See* Elyse J. Garmise, *The Iraqi Claims Process and the Ghost of Versailles*, 67 N.Y.U.L.Rev. 840, 841 (1992). Thus, it is evident that responsibility for resolving forced labor claims arising out of a war is constitutionally committed to the political branches of government, not the judiciary.

In a footnote to this discussion, the court observed that the " 'concept of reparations encompasses all international law claims for compensation related to war [including] individual claims by injured citizens of victorious powers.' " *Id.* at 485 n.84 (quoting Ministerial Director Horst Teltschik).

When California attempted by legislation to insert itself into Holocaust-era insurance policies, the Supreme Court stepped in and held that California's law was preempted because it interfered with the President's conduct of our Nation's foreign policy. In reversing our Ninth Circuit opinion to the contrary, *see Gerling Global Reinsurance Corp. of Am. v. Low*, 296 F.3d 832 (9th Cir. 2002), the Court made certain observations about the authority of the President that add considerable weight against the view that Alperin's claims are justiciable:

> Nor is there any question generally that there is executive authority to decide what that [foreign relations] policy should be. Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the "executive Power" vested in Article II of the Constitution has recognized the President's "vast share of responsibility for the conduct of our foreign relations."

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (citation omitted). The *Garamendi* court continued:

> At a more specific level, our cases have recognized that the President has authority to make "executive agreements" with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic. See *Dames & Moore v. Regan*, 453 U.S. 654, 679, 682-683, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *United States v. Pink*, 315

U.S. 203, 223, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont*, 301 U.S. 324, 330-331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); see also L. Henkin, Foreign Affairs and the United States Constitution 219, 496, n. 163 (2d ed.1996) ("Presidents from Washington to Clinton have made many thousands of agreements . . . on matters running the gamut of U.S. foreign relations"). *Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice, the first example being as early as 1799, when the Adams administration settled demands against the Dutch Government by American citizens* who lost their cargo when Dutch privateers overtook the schooner *Wilmington Packet*. See *Dames & Moore*, *supra*, at 679-680, and n. 8, 101 S.Ct. 2972.

\* \* \*

To begin with, resolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, *Pink, supra*, at 225, 62 S.Ct. 552, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries, *Dames & Moore*, 453 U.S., at 679, 101 S.Ct. 2972. The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, *securing private interests is an express object of*

*diplomacy today, just as it was addressed in agreements soon after the Second World War.* Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

*Id.* at 415, 420-21 (emphasis added).

Finally, as we recognized in *Deutsch v. Turner Corp.*, 324 F.3d 692, 712-13 (9th Cir. 2003),

The United States has already exercised its own exclusive authority to resolve the war, including claims arising out of it. It did not choose, however, to incorporate into that resolution a private right of action against our wartime enemies or their nationals. The United States resolved the war against Germany by becoming a party to a number of treaties and international agreements, beginning with the 1945 agreements at Yalta and Potsdam, in which the United States, Britain, and the Soviet Union agreed to extract reparations from Germany and its nationals but did not include a private right of action against either. . . . Most recently, the Foundation Agreement of July 17, 2000, an executive agreement between the governments of Germany and the United States, provided a limited form of remedy for claimants such as Deutsch.

I would add that we entered into a similar treaty with Italy in 1947. Article 75 of that Treaty provides with respect to restitution as follows:

1. Italy accepts the principles of the United Nations Declaration of January 5, 1943, and shall return, in the shortest possible time, *property*

*removed from the territory of any of the United Nations.*

2.    *The obligation to make restitution applies to all identifiable property* at present in Italy which was removed by force or duress by any of the Axis Powers from the territory of any of the United Nations, irrespective of any subsequent transactions by which the present holder of any such property has secured possession.

. . . .

8.    The Italian Government shall restore to [the United Nation] all monetary gold looted or wrongfully removed to Italy.

Treaty of Peace with Italy, Feb. 10, 1947, U.S.-Italy, United States Statutes At Large, Vol. 61, pp. 1400-01.

## II

As recognized by the majority, "the potential class is massive," and, as the district court concluded, the case as pleaded would be unmanageable. This unimpeachable observation brings this lawsuit within *Baker's* second category: the task is beyond the competence of a court of law. The district court relied, in this respect, on *Kelberine v. Societe Internationale*, 363 F.2d 989 (D.C. Cir. 1966), which correctly said,

The span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tortfeasors is too indefinite. The procedure sought — adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power — is too complicated, too costly, to justify

undertaking by a court without legislative provision of the means wherewith to proceed.

*Id.* at 995.

I agree with our prudent district court's carefully considered opinion, which echos the Supreme Court's concerns in *Waterman* about the aptitude and facilities in this context, that this case as presented would lack judicial reins:

> Here, by contrast, plaintiffs do not seek recovery of money and assets withheld from specific accounts but, rather, the undetermined value of property stolen in untold ways in a multiplicity of regions by both military personnel and civilians. Moreover, plaintiffs seek such recovery out of an undivided portion of the Ustasha Treasury transferred to the IOR. Such claims require a review of materials from a multitude of foreign sources that, "by sheer bulk alone," are likely to be unmanageable. *See Atlee*, 347 F. Supp. [689, 701 (E.D. Pa. 1972)]. Compounding the problem, "there is a distinct possibility that the parties might not be able to compile all of the relevant information, thus making any attempt to justify a ruling on the merits of an issue that will affect the nation difficult and imprudent." *See Iwanowa*, 67 F. Supp. 2d [424, 483-84 (D.N.J. 1999)]; *see also Atlee*, 347 F. Supp. at 702 (noting "the inherent inability of a court to predict the international consequences flowing from a decision on the merits.") Further, plaintiffs' claims require this Court to resolve the competing rights to the Ustasha Treasury of potentially hundreds of thousands of citizens of various nations, funds as to which any number of persons harmed by the Ustasha regime, both represented and not represented in these proceedings, might equally assert a claim.

*Alperin*, 242 F. Supp. 2d at 694-95. It will be interesting to say the least to watch the district court struggle on remand to enforce its rulings against the Vatican. Based on my experience with litigation involving foreign nations, it will be just a matter of time until the State and Justice Departments are dragged into this case as the district court begins to reach out for evidence and witnesses and to exercise its power to enforce its orders.

## III

No one could possibly be comfortable identifying a barrier to the relief sought by these plaintiffs, persons who suffered some of the most unspeakably grievous injuries to their lives and families. As Judge Reinhardt said in *Deutsch*, the Holocaust was "the most atrocious act ever perpetrated by a civilized (or uncivilized) people, an act unparalleled in history." 324 F.3d at 704. Nevertheless, our courts are not the appropriate fora for redress. What the majority has unintentionally accomplished in embracing this case is nothing less than the wholesale creation of a World Court, an international tribunal with breathtaking and limitless jurisdiction to entertain the World's failures, no matter where they happen, when they happen, to whom they happen, the identity of the wrongdoer, and the sovereignty of one of the parties. The consequences of this holding are overwhelming. I need go no deeper than the third amended class action complaint to illustrate this point:

> 1. This is a civil action arising under customary international law and the laws of the United States of America on behalf of named Plaintiffs and a class of all Serbs, Jews, and former Soviet Union citizens (and their heirs and beneficiaries), who suffered physical, monetary and/or property losses including slave labor, due to the systematic and brutal extermination of Jews, Serbs, and Romani by the Nazi puppet Regime, The Independent State of Croatia

(NDH) led by Pavelic's Ustasha Regime, and as a result of the occupation of the former Soviet Union by Croatian military forces in concert with their German occupation forces. This is an action against the Vatican Bank, Franciscan Order and Unknown Catholic Religious Orders, Croatian Liberation Movement (HOP), Swiss National Bank (SNB) and as yet unnamed recipients of Nazi and Ustasha Loot, Swiss, Austrian, Argentine, Spanish, Italian, Portuguese, and German banking institutions and California and other United States correspondent banks for their participation in and benefit from the Ustasha Regime's acts of cruelty and violence.

2. Plaintiffs and their heirs and beneficiaries seek accounting, restitution, disgorgement, and to recover damages arising out of the participation of Defendants, Vatican Bank or Istituto Per Le Opere Di Religione (hereinafter referred to as IOR), the Franciscan Order (OFM) and Unknown Catholic Religious Orders, Croatian Liberation Movement (HOP), Swiss National Bank (SNB), unknown recipients of Nazi and Ustasha loot, and other banking institutions and correspondent banks and religious orders and organizations in a common scheme and course of conduct: (a) to profit from, both directly and indirectly, the inhumane and genocidal system instituted by the Nazi-directed Ustasha Regime in Croatia and territories subject to Croatian civil or military occupation upon those peoples that it viewed, not as human beings, but as subhuman according to Nazi and Ustasha ideology; (b) to obtain, accept, conceal, convert and profit from assets looted by the Ustasha Regime and deposited in, or liquidated through, the IOR, SNB, unnamed Doe Defendant Banks, and Franciscan Order during the ascendancy of the Ustasha Regime and following the demise of the Regime at the behest of the former Ustasha and Nazi

leaders through the offices of the Franciscan Order; and (c) to retain and convert assets deposited in their institutions by the Croatian Liberation Movement, Ustasha and/or the Franciscan Order and Unknown Catholic Religious Orders.

3. Defendants committed, conspired to commit, and aided and abetted others who committed crimes against peace, war crimes and crimes against humanity. Defendants assisted the Ustasha Regime and its leaders as well as prominent Nazis to successfully evade justice for their genocidal crimes by concealing and making available the considerable assets of the Ustasha Treasury.

\* \* \*

**WHEREFORE, Plaintiffs pray that the Court:**

1. Certify this action as a class action pursuant to FEDERAL RULE OF CIVIL PROCEDURE 23, and designating named Plaintiffs as the class representatives and counsel for Plaintiffs as Class counsel.

2. Declare that Defendants by trafficking in, retaining, disposing of and concealing assets looted from targets of the Ustasha Regime with knowledge that the assets had been obtained through the systematic persecution, torture, slave labor, force, and murder, violated international treaties and customary international law enforceable in this Court as federal common law, the law of the nations and international law.

3. Order Defendants to make available all information relating to the Ustasha Treasury in order that an accounting of assets may be realized.

4. Direct Defendants to return all identifiable property looted from Plaintiffs and received by Defendants.

5. Award Plaintiffs the value of any identified property deposited by, or looted from, Plaintiffs and received by Defendants plus interest compounded annually since 1941.

6. Award Plaintiffs compensatory and punitive damages arising out of Defendants' unlawful behavior in trafficking in, retaining, disposing and concealing Looted Assets or profits of the Ustasha Regime with knowledge that the assets or profits were the fruits of Nazi-Ustasha violations of international law and were used to assist war criminals to evade justice.

7. Order Defendants to disgorge any profits earned by trafficking in, disposing of or concealing the Ustasha Treasury which was the fruits of violations of international law.

8. Grant Plaintiffs a jury trial on all issues so triable.

9. Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expert fees; and,

10. Grant such other and further relief as shall seem just to the Court.

Our unauthorized transformation of our district courts into an open-door international tribunal far overreaches the authority of "the least dangerous branch" of our government. This opinion, albeit well-intentioned, extends the concept of judicial authority into unknown territory and mistakenly exercises

power and competence that plainly belongs to the President and to Congress. Today, it is the Vatican and the Holocaust. Tomorrow, will it be horrors from Haiti, Cuba, Rwanda, South Africa, the Soviet Union, Bosnia, Sudan, Somalia, North Korea, Iraq, and who knows where? The majority opinion sends our district judges on a crusade from which they are not equipped and which is doomed to flounder. As a class action, it will make all others seem like cakewalks. One can only wonder if the filing of this lawsuit is nothing more than a ploy to force the President and the State Department to take action. Similarly, one can only wonder why the beleaguered State Department would stand silently by and allow this case to continue — in the Ninth Circuit no less, where mistakenly we would have allowed the *Garamendi* litigation to proceed.

Thus, I respectfully disagree that Alperin's unseverable "garden-variety" claims are justiciable.